UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RODERICK REYES

                                    Plaintiff,

              v.                              **COMPLAINT**

DAVID DINELLO, JOHN HAMMER and ROBERT       23-cv-3315
BENTIVEGNA,
                                            (Related 19-cv-8173(LAP))
                                    Defendants.

          This is a civil rights suit by Plaintiff, Roderick Reyes, a prisoner in the custody of the

New York State Department of Corrections and Community Supervision ("DOCCS") who

required effective medication to treat his chronic health conditions. As the following complaint

makes clear, starting as early as 2015, DOCCS implemented a series of unwritten policies

directed at discontinuing patients from medications that DOCCS' medical administrators felt

had abuse potential irrespective of a patient's individualized needs.  Medical providers would

tell patients, "we don't give that medication here," "that medication is not used in DOCCS," or

they would find other justifications for discontinuing MWAP medications – even if the patients

had been effectively treated for years.

          In 2017, the informal practices of discontinuing medications were distilled into the

Medications With Abuse Potential ("MWAP") Policy, authored by David S. Dinello and

approved and implemented by his colleagues, DOCCS' medical administrators Carl

Koenigsmann, John Morley, Susan Mueller, John Hammer and Paula Bozer.  A benign reading

of the MWAP Policy suggested a stated goal of reducing the prescription of MWAPs in the

correctional  setting.   MWAPs  include  medications  such  as  opioids,  neuromodulating

medications such as Neurontin and Lyrica and medications such as Baclofen and Flexeril administered to treat severe muscles spasms. For a medical provider within DOCCS to prescribe any of these MWAPs, the Policy demanded the approval of a Regional Medical Director ("RMD") or the Chief Medical Officer ("CMO") before the prescription could be filled. The MWAP Policy stripped medical treatment decisions from the medical providers and specialists who treated patients and put it in the hands of remote medical administrators, who invariably denied the requests for MWAP medications, no matter the patient's individual medical needs. The denial of these medications especially affected an already vulnerable population: one that included patients with severe spinal and neurological issues, phantom pain from amputations, multiple sclerosis, and serious, chronic pain.

Worse, the written policy and its restrictions created and enforced practices beyond the MWAP policy – including the discontinuation of medications when patients transferred between facilities, discontinuations based on non-medical reasons like accusations by corrections officers of diversion, and the rejection of recommendations of outside specialists for treatment of patients with MWAP medications despite medical necessity. Instead of effectively treating patients, providers and mid-level clinicians would repeatedly prescribe ineffective alternatives, including medications with unbearable side effects. Under MWAP and the related policies, customs, and practices thousands of DOCCS' patients suffered, including Plaintiff.

## JURISDICTION AND VENUE

1. This action arises under 42 U.S.C. § 1983, *et seq*.

2. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 (a)(3)-(4).

3. The acts complained of occurred in the Southern District of New York and other jurisdictions throughout New York State. Venue is proper under 28 U.S.C. § 1391(b).

## JURY DEMAND

4.      Plaintiff demands trial by jury in this action.

## THE PARTIES

### Plaintiff

5.      Plaintiff Roderick Reyes ("Mr. Reyes" or "Plaintiff") is a prisoner currently in the custody of DOCCS.

6.      Mr. Reyes suffers from sickle cell anemia and requires continuous pain management to control his chronic and significant pain associated with that disease.

### Defendants and State Actors

7.      **DOCCS** is responsible for the confinement and rehabilitation of approximately 35,000 individuals in its custody at approximately 44 state facilities.

8.      DOCCS is responsible for the medical care of all inmates in its custody.

9.      DOCCS receives state and federal financial assistance.

10.     Neither the New York Health Department of Health nor any other entity provides oversight to DOCCS' medical treatment, other than relating to infectious diseases like tuberculosis or hepatitis C.

11.     DOCCS' medical administration effectively creates its own rules.

12.     **Carl Koenigsmann, MD ("Koenigsmann")** served as the Chief Medical Officer ("CMO") for DOCCS until late 2018.

13.     **John Morley, MD ("Morley")** served as the CMO for DOCCS until mid-2020.

14.     **Carol Moores, MD ("Dr. Moores")** currently serves as the CMO for DOCCS. She started in that role in July of 2022.

15.     **Susan Mueller, MD ("Mueller")** is a Regional Medical Director ("RMD") and

a treating physician at DOCCS.

16.     **Paula Bozer, MD ("Bozer")** is an RMD and a treating physician at DOCCS. Bozer served on the Policy Review committee for DOCCS which oversees the development and necessary changes to medical policies.

17.     **Defendant John Hammer, MD ("Defendant Hammer")** is an RMD and treating physician at DOCCS. He is sued in his individual capacity.

18.     **Defendant David S. Dinello, MD ("Defendant Dinello")** was an RMD and treating physician at DOCCS. He is sued in his individual capacity. Dinello was Chairman of the Pharmacy and Therapeutic Committee for DOCCS.  He is sued in his individual capacity.

19.     **Defendant Robert Bentivegna, MD ("Defendant Bentivegna") is the Facility Health Services Director** and a treating physician who works for DOCCS.  He is sued in his individual capacity.

20.     **Lester Silver, MD ("Dr. Silver")** is a physician who worked at DOCCS.  He is sued in his individual capacity.

21.     **Facility Treating Physicians and Mid-Level Clinicians ("MDs and Mid-Level Clinicians")** are responsible for the medical treatment of prisoners within the facility where they work. Facility doctors, physician assistants and nurse practitioners answer to the FHSDs, RMDs and CMO.

22.     **Consultants and Specialty Medical Providers** ("Consultants" or "Specialists") are medical professionals who practice either in DOCCS' Regional Medical Unit specialty clinics or outside of DOCCS at area hospitals, emergency rooms and specialty offices. Patients are sent to them for specialty assessment and treatment because DOCCS doctors and specialists do not possess the requisite expertise to treat the referred patient.

**FACTUAL HISTORY – HOW DOCCS ADMINISTERED HEALTH CARE**

**The Role of the Chief Medical Officer ("CMO")**

23.     The CMO is the ultimate arbiter of medical policy for DOCCS.

24.     CMO Koenigsmann was the ultimate arbiter of medical policy for DOCCS through late 2018.

25.     Though the CMO normally does not treat individual patients, the CMO is directly involved with DOCCS' Office of Counsel and the Attorney General's office when a patient sues DOCCS, often coordinating with RMDs, treating physicians, mid-level clinicians, and medical personnel on the facility level to review the patient's records and craft medical and legal responses. The CMO makes decisions that directly impact the health care of individual patients.

26.     Koenigsmann and Morley were responsible for crafting policies and procedures for medical treatment of patients in DOCCS' custody, including overseeing primary care guidelines for treatment and medical health care policies, during their respective tenures.

27.     The CMO is charged with developing and regularly updating clinical practice guidelines in an effort to maintain consistency of care throughout the correctional setting and to stay current with scientific advances and community standards of treatment.

**The Role of Regional Medical Directors ("RMDs")**

28.     Dinello, Hammer, Mueller, and Bozer were also responsible for crafting policies and procedures for medical treatment of patients in DOCCS' custody, including overseeing primary care guidelines for treatment.

29.     Dinello, Hammer, Mueller and Bozer were charged with developing and regularly updating clinical practice guidelines to maintain consistency of care throughout the correctional setting and to stay current with scientific advances and community standards of

treatment.

30.     Each RMD is responsible for a "hub." A DOCCS' medical hub is a group of correctional facilities within a region. There are five hubs within DOCCS.

**The Role of MDs and Mid-Level Clinicians**

31.     MDs and Mid-Level Clinicians are the Facility Health Services Directors, treating physicians and mid-level clinicians within DOCCS' 44 facilities.

32.     The MDs and Mid-Level Clinicians are directly responsible for the healthcare of prisoners in the custody of DOCCS.

33.     The MDs and Mid-Level Clinicians are directly responsible for examining patients during sick call and scheduled examinations. Along with nurses, MDs and Mid- Level Clinicians respond to the medical complaints of patients regarding chronic pain, neurological, and other health issues.

34.     The MDs and Mid-Level Clinicians are directly responsible for referring patients out for specialist diagnostic testing including MRIs, X-Rays, and electromamyograph ("EMG") testing which assesses the health of muscles and motor neurons.

35.     The MDs and Mid-Level Clinicians are directly responsible for prescribing medications available in the DOCCS' "Formulary Book" when patient requires prescriptive care.

36.     The DOCCS' "Formulary Book," lists all the medications available for doctors to prescribe without approval from an administrator.

37.     For prisons, formularies are also established to ensure that the drugs prescribed are convenient to administer in a correctional environment and have a low potential for abuse.

38.     The 2019 DOCCS' "Formulary Book," included Neurontin as a formulary

medication. To prescribe, a provider "requires a diagnosis on the prescription;" it must be "nurse administered;" and it is "non-formulary for an O[ffice] of M[ental] H[ealth] diagnosis and use."

39.     MDs and Mid-Level Clinicians cannot prescribe medications that are "Non-Formulary" without the approval of an administrator.

40.     Historically, Non-Formulary medications included narcotics, medications "Scheduled" in accordance with the Controlled Substances Act, and medications not generally carried in DOCCS' pharmacies.

41.     Before late 2022, if an MD or Mid-Level Clinician prescribes a Non-Formulary medication he/she had to submit a Non-Formulary Request to an RMD for approval.

42.     To submit the Non-Formulary Request for approval, MDs and Mid-Level Clinicians supplied information to the RMD, including 1) Name of person requesting med, if not MD 2) whether the medication is a Consultant[or Specialist] Recommendation 3) Generic or trade name of non-formulary drug 4) dose, frequency, dosage form, quantity requested, prior approval number; 5) Condition treated 6) Other associated conditions 7) Formulary alternatives tried (must list medication, dose, frequency and duration; 8) Comments.

43.     An RMD reviewed the Non-Formulary Request and added comments along with his/her initials to show approval, along with an Approval number for tracking with the pharmacies.

**The Role of Consultants and Specialty Medical Providers**

44.     MDs and Mid-Level Clinicians are directly responsible for submitted referrals for patients to outside consultants and specialists when MDs and Mid-Level Clinicians are not skilled or experienced enough to diagnose or treat specific conditions.

45.     According to Dinello, "If the patient has a medical issue that we need help

managing, we would send them to a referral, a consultant, to help us manage the case."

46.     DOCCS Health Services Policy states, "Referrals for outpatient care will be requested only when necessary medical assessment and treatment services are not available from facility primary care providers."

47.     To facilitate a Referral, an MD or Mid-Level Clinician submits a "Request and Report of Consultation" ("Referral") that includes a synopsis of the patient's particular medical issue drafted by the referring medical provider on the facility level and the reasons he/she believes a visit with a specialist is necessary.

48.     DOCCS' outside quality control provider, Kepro, then reviews the speciality appointment request and approves or denies it.  If denied, an RMD can override the denial.

49.     At the appointment, the specialist then fills out his/her findings on the bottom half of the "Referral," generally in hand.  Sometimes the specialist attaches his/her computer-generated report, like an EMG reading. The specialist report is then given to the MDs and Mid-Level Clinicians for review.

50.     The MDs and Mid-Level Clinicians personally review the reports and recommendations of specialists who treat patients.

51.     To record the fact that an MD or Mid-Level Clinician has reviewed the specialist report and recommendation, he/she initials the report with the date of review.

52.     The MD or Mid-Level Clinician then makes a notation in the patient's AHR regarding the findings and recommendations of the specialist.

53.     The MDs and Mid-Level Clinicians are directly responsible for prescribing specialist-recommended medications.

54.     Treating consultants or specialists have no ability to directly ensure prescriptions

to DOCCS' patients, they can only make recommendations to the treating MDs and Mid-Level Clinicians through their reports.

55.       According to Division of Health Services Policy 3.02 "Medication Orders Within DOCCS Facilities," procedure, "Consultants [and/or Specialists] may recommend medication treatment for inmates, but it is the responsibility of the Department's primary care provider to review the consultant's recommendations and determine the course of therapy. The facility prescriber may modify or decline the recommendations but ***must document their reasons for doing so*** in the Ambulatory Health Record."

56.       In the medical records of over 110 affected patients, **NOT ONCE** did MDs or Mid-Level Clinicians document the reasons for ignoring or dismissing the prescriptions and recommendations of outside consultants and specialists after the MWAP Policy was promulgated (or before).

**DOCCS' Medical Records Thwart Patient Care**

57.       In fact, the single biggest impediment to even basic health care within DOCCS is the health records system that allows for incomplete, inaccurate, and chaotic medical records.

58.       Patient records are kept in two places: the paper copy ambulatory health record ("AHR") kept at the facility and an electronic rendition maintained on the Facility Health Services Database ("FHS1").

59.       The AHR is maintained in two files: a small "active" file kept in the clinic with the most recent provider notes and specialty recommendations and an "inactive" file kept somewhere else in the facility in storage.

60.       Nurses or clerks often "thin" a patient's active file and take older materials to be stored in the inactive file.

61.     If a provider, RMD or CMO needs to consult with older specialist recommendations, diagnostic testing or results, he/she must get someone at the facility to go through the inactive file boxes and look for the relevant materials.  Far more often, the provider, RMD or CMO relies upon inaccurate entries on the FHS1 system.

62.     The FHS1 records are electronically stored on a network accessible through monitors in each DOCCS facility or administrative office.

63.     Through the FHS1, RMDs have limited access to a patient's history of specialty appointments, hospital stays, prescription histories, medical problem lists or specialist recommendations

64.     The FHS1 entries are input at the facility and, generally, are incomplete renditions of the patients' medical problems, the recommendations of specialists and provider interactions.

65.     Many FHS1 entries leave out the most relevant information.  For instance, on January 5, 2018, Mr. Reyes, who suffers from constant hospitalizations due to sickle cell crises, saw Dr. Ahmed Asif, his hematologist.  Dr. Asif recommended that DOCCS' providers, "continue his original dose [of MS Contin] at 60 mg [twice a day] to keep him from going to the hospital.  For breakthrough pain use Motrin 800 mg PO [three times a day as needed]."

66.     The correlating FHS1 entry for Dr. Asif's recommendation says, "[Return to Clinic] [none] no [follow-up] indicated. Recommend labs every month."

67.     Anyone reading the FHS1 entry would have no idea that Dr. Asif wanted the patient maintained on 60mg twice a day of MS Contin to keep the patient out of the hospital with sickle cell crises.

68.     These inaccuracies are rampant and all-too-common in the FHS1 system.

**Medical Intake At DOCCS**

69.     When a patient is first 'drafted in' to DOCCS he/she generally resides at a reception facility until staff conducts a medical assessment and a department called "Movement and Classification" determines the best housing for the patient.

70.     The medical staff at a reception facility maintains a patient on all the medications and prescriptions he/she was taking before being "drafted in" to ensure continuity of care.

71.     The medical staff at the reception facility conduct a thorough individualized assessment of the patient's health issues for use by practitioners in receiving facilities.  Their findings related to major disease or mobility issues are entered into the patient's Medical Problem List.

72.     Upon transfer to a facility for housing, a nurse is supposed to conduct an "assessment,' of the patient. If an prisoner needs medications prescribed, a medical provider is given the medication list to review for ordering.

73.     MDs and Mid-Level Clinicians often do not see or examine the patient, nor do they review the medical charts before stopping or re-prescribing medications on intake. Sometimes, the patient's AHR has not even arrived with them.  As a consequence, patients lose necessary and/or effective medications without even seeing a provider.

74.     Long before promulgation of the MWAP Policy, these abrupt discontinuations of medications were based on nothing more than a facility "policy," as each FHSD and/or physician initiated his/her own preferences with little regard to continuity of care or the needs of the patient.

75.     A patient could be bounced around facilities and have his medications changed each and every time at the whim of medical personnel once he is in the system.

76.     However, before promulgation of an MWAP Policy, if a patient was lucky and ended up at a facility with good health care practitioners, the patient could receive compassionate, appropriate and constitutionally adequate medical care, including MWAP medications to treat his/her chronic pain or neurological issues.  Unfortunately, after MWAP patients even lost a shot at the luck of the draw.

**<u>Medications With Abuse Potential</u>**

77.      On its MWAP list, DOCCS included a group of rather ubiquitous medications, including but not limited to the following:

78.     Ativan (generic name Lorazepam) is used to treat anxiety.

79.     Baclofen is a muscle relaxer and antispasmodic agent used to treat Multiple Sclerosis, spinal cord injuries and other spinal cord disorders. There are no other medications that work in the same way Baclofen works.

80.     Fentanyl (this is the generic name) is a synthetic opioid that is 80-100 times stronger than morphine.  It should only be used in cancer patients or others with truly unremitting pain.

81.     Flexeril (generic name "Cyclobenzaprine") is also a muscle relaxer that works by blocking nerve impulses to the brain.  Flexeril is used in short term doses to control muscle spasms.

82.     Imodium is used to treat diarrhea.

83.     Klonopin (generic name Clonazepam) is used to prevent and control seizures, as well as treat panic attacks.

84.     Lyrica (generic name "Pregabalin") is used to treat fibromyalgia, diabetic nerve

pain, spinal cord injury nerve pain and other nerve related pain symptoms. Lyrica is often prescribed in lieu of Neurontin or when Neurontin fails for any number of reasons.[2] Lyrica is a scheduled medication.

85.     Marinol (generic name Dronabinol) is a man-made form of cannabis used to treat appetite issues, severe nausea and vomiting.

86.     MS-Contin (also referred to as Morphine Sulfate, MSSR, Morphine Elixir) is an opioid analgesic used to treat acute and chronic, severe pain.

87.     Neurontin (generic name "Gabapentin") is an anticonvulsant generally taken to control seizures. It is also often prescribed to relieve nerve pain and considered an alternative to Lyrica.[3] Historically, in DOCCS, a patient is prescribed Neurontin if an EMG test shows neuropathy.

88.     Percocet is a combination of oxycodone and acetaminophen used to treat moderate to severe pain.

89.     Phenobarbitol is a barbiturate that slows the activity in the brain and nervous system and is used to treat or prevent seizures.

90.     Robaxin (generic name Mathocarbamol) is a muscle relaxant used to treat skeletal muscle conditions and spasming.

91.     Tylenol #3 (Tylenol-Codeine) is used to relieve mild to moderate pain.  It does contain an opioid pain reliever (Codeine).

92.     Ultram (generic name "Tramadol") is a pain management medication used to treat moderate to moderately severe pain in patients.  The dose should be individualized to a patient's needs and a patient should not take more than necessary to control his/her pain.  Ultram is considered a lower risk alternative to Percocet or other narcotics or opiates.

93.     Vimpat (generic name Lacosamide) is used to treat partial-onset seizures.

94.     Xanax (generic name Alprazolam) is used to treat anxiety and panic disorders.

95.     Xarelto (generic name Rivaroxaban) is used to reduce the risk of stroke.

96.     Zanaflex (generic name Tizanidine) is used to treat muscle spasms caused by conditions like multiple sclerosis and spinal cord injuries.

97.     These medications are not risk free. Like any medication they can be abused, but many of them – including Neurontin and Lyrica -- are considered to have low addiction potential.

98.     The use of the medications DOCCS deemed MWAP certainly engenders some risk.

99.     In fact, DOCCS, its physicians and mid-level clinicians have been aware of the risks of these medications for decades.

100.    DOCCS' physicians and nurses have submitted at least 41 sworn declarations in federal district courts in the Second Circuit since 2006 discussing the dangers of Neurontin and Ultram within the prison population due to risk of abuse.

101.    Nonetheless, like all physicians, DOCCS physicians and mid-level clinicians continued to prescribe the medications when appropriate as effective treatment for patients' ailments.

102.    To adapt to the risks of diversion and abuse, DOCCS developed a number of policies over the last twenty years including 1) the administration of the medications one-on-one, meaning a nurse watches as the medication is taken by a patient; 2) the crushing and dilution in water so a patient must drink the medication; and, most recently, 3) the administration of certain medications, including Neurontin, in liquid form.

103.    DOCCS can also (and sometimes does) administer a simple blood test that measures the amount of certain MWAPs in a patient's blood stream, as well as the presence of any other illicit medications or drugs. This allows doctors to tell whether a patient is diverting medication or is at risk of negative interactions with other medications or drugs.

104.    If an RMD, MD or Mid-Level Clinician is concerned about an individual patient's diversion or misuse of MWAP medications, he/she can easily request a blood test to confirm or deny the concerns.

105.    And the inclusion of some of the medications on the MWAP List is just plain ridiculous.  Dr. John Bendheim testified under oath that he could not get Imodium for a patient to abate severe diarrhea.  The patient had to suffer.  It is of note that Imodium is abused when it is taken in very large quantities.  DOCCS patients do not have access to the amount of Imodium it would take to get high.

**Standard of Care in the Correctional Environment**

106.    As implemented, the MWAP Policy was an almost wholesale restriction on the prescription of MWAPs, except in cases of acute need or palliative care.  A complete ban on use to treat chronic conditions does not comport with the standards adopted by other prison systems or the Standard of Medical Care in the community.

107.    For instance, NYS DOCCS is an accredited member of the National Commission on Correctional Health Care ("NCCHC").

108.    In 2018, the NCCHC published a position statement on "Management of Noncancer Chronic Pain."

109.    The position states, "Because complaints of chronic pain are common in corrections, corrections clinicians must address the challenges presented. The use of adjunctive

medications such as opiates or GABA analogues [these include Neurontin and Lyrica] is particularly troublesome in the correctional environment because of very high percentage of inmates have a history of substance abuse, chemical dependency, and misuse of prescription medications . . . On the other hand, the confinement environment provides opportunities to obtain information (e.g., a patient's physical activities in the housing unit, at recreation, and at work) that can be important when assessing function and when reviewing the efficacy of treatment . . . Therefore, when patient function remains poor and pain is not well controlled, and other options have been exhausted, a therapeutic trial of medication, including opioids, should be considered.    Clinicians should not approach the treatment of chronic pain as a decision regarding the use or nonuse of opioids (as in acute pain). Rather clinicians should consider all aspects of the problem and all available proven modalities."[4]

110.    In its further statement, NCCHC recommended: "Chronic pain should be addressed like other chronic medical conditions, in a systematic, objective, structured manner beginning with diagnosis and treatment planning and proceeding with structured and regular monitoring of progress. Clinicians should establish measurable treatment goals for chronic pain and measure progress against them. . . They must be functional in nature, measured against the patient's established baseline . . . Most chronic pain can be managed through primary care clinicians. However, an interdisciplinary team approach is often beneficial, and specialty care, including pain management, should be available for patients whose function and chronic pain are not improved with treatment… Policies banning opioids should be eschewed.  Opiates should be considered with caution after weighing other treatment options."

111.    In June of 2018 the Federal Bureau of Prisons ("BOP") published its "Pain Management of Inmates," Clinical Guideline.[5] Even the BOP clinical guideline does not prohibit

the use of opioids or neuromodulating medications like Lyrica and Neurontin.

112.    The BOP Clinical Guideline lists Neurontin and Lyrica as second line treatments for neuropathic pain after TCA and SNRIs.[6]

113.    DOCCS is also accredited by the American Correctional Association ("ACA"). The ACA website lists the BOP's Clinical Guideline, "Pain Management of Inmates," as its clinical guideline standard.[1]

114.    In fact, The New York State Department of Health has only two main concerns regarding Neurontin/Gabapentin: it recommended avoiding prescriptions in doses higher than 3600 mg per day because there is no evidence of increase in therapeutic dose, and it recommended avoidance of use of Neurontin by a patient benefiting from concurrent opioid treatment.

115.    The American Medical Association ("AMA") also does not restrict the prescription of many of the medications on the MWAP list and Koenigsmann knew that.  In an October 27, 2017 email he wrote, "Except for expanding the limitations to some highly abused non-opiate medications nothing in the MWAP is outside of DOH and national recommendations for prudent opioid use."   Opioid abuse was one thing, Koenigsmann and Dinello knowingly restricted medications far beyond any restrictions found in the community.

116.    In fact, the AMA House of Delegates is focused on removing barriers to treatment and appropriate analgesic prescribing for pain management.  The AMA House of Delegates has directed the AMA to actively lobby to have Medicare and Medicaid Services allow for reimbursement of off-label prescription of medications, including Neurontin, "at the

---

[1]https://www.aca.org/ACA_Prod_IMIS/ACA_Member/Healthcare_Professional_Interest_Section/HC_ResourceLibr aryHome.aspx?WebsiteKey=139f6b09-e150-4c56-9c66-284b92f21e51&hkey=6e0f7ed7-c302-4679-9dc6-013fc2b62810&New_ContentCollectionOrganizerCommon=2#New_ContentCollectionOrganizerCommon

lowest co-payment tier for the indication of pain so that patients can be effectively treated for pain and decrease the number of opioid prescriptions written."

117.    The standard in the medical community is to use medications like Neurontin, Lyrica and other non-opioid MWAPS to treat chronic conditions to reduce the number of opioid prescriptions.  The standard in the medical community is not to restrict all effective treatment.

118.    The reality is that incarcerated patients have a higher-than-average prevalence of disease, as well as substance use disorders and psychiatric illness, often in combination.[7]

119.    Prison populations also have a higher than normal incidence of patients with major spinal cord injuries, due to traumatic events and gun violence.

120.    Treatment protocols are also necessarily different in prisons. Diet modification, exercise and non-medicinal treatments are not as available. Patients in prisons often wait months to see specialists, receive diagnostic testing, surgeries and follow-up care.

121.    Therefore, pharmaceuticals, which already play an important role in the U.S. health care system, may take on an even greater therapeutic importance in prisons.

122.    A December 2017 Pew Charitable Trust study found that use of prescription drugs in the prison population may decrease total medical costs because appropriate use of prescription drugs can avert even more expensive unplanned hospital admissions.[8]

123.    Unlike many of the medications on DOCCS' MWAP list, many psychiatric drugs are 'low cost' due to their availability of reasonable lower-costs psychotropic alternatives and the drop in the high price of some older ones due to these drugs coming off patent during the last several years.[9]

**Policies Before The MWAP Policy Implementation**

124.   Before the MWAP Policy, DOCCS' physicians, including the RMDs, already had troubling "policies" regarding MWAPs.

125.   The more punitive MDs and Mid-Level Clinicians would stop a patient's medications for reasons totally unrelated to patient care. If the patient does not show up at the medication window or if the patient is accused of diverting or abusing medications, the prescriptions could be discontinued with no notice. Medical providers discontinue medications without any investigation into the alleged incident or exploration of why a patient might be missing medication window visits.

126.   Sometimes a brave patient sued for deliberate indifference to his/her medical needs when necessary, effective medications were abruptly discontinued.

127.   DOCCS' defendants repeatedly rolled out two justifications for stopping a patient's MWAP medication. They signed declarations that asserted: 1) the patient is a drug addict or abuser, or, 2) the DOCCS defendant listed each and every time an Ambulatory Health Record entry exists for the patient, implying because he/she was seen by a health care practitioner there was no deliberate indifference.[10]

128.   Dr. Janice Wolf, a DOCCS doctor, summarized DOCCS' position best in an email to RMDs, "[So long as the patient] is seen within a reasonable amount of time, complaint addressed, exam documented, and rational for medical decision made [we're safe]. Hopefully, the A[ttorney] G[eneral]'s office will defend us this way."

129.   DOCCS doctors report being told on many occasions that as long as they "prescribe Tylenol" their actions could not be considered deliberate indifference.

130.   In fact, Dinello repeatedly told various DOCCS' providers not to worry about

lawsuits because the "lawyers take care of it."

131.    A sampling of 133 public *pro se* prisoner cases alleging deliberate indifference for the revocation of Neurontin or Ultram by DOCCS physicians in the Second Circuit demonstrate that the Attorney General's office systematically submited a standard declaration signed by a DOCCS medical provider accusing the *pro se* plaintiff of diversion, drug abuse, or hoarding.

132.    In every single sampled case the pleadings were dismissed due to the *pro se* prisoner's inability to rebut the accusations.

133.    In another large sampling of *pro se* Eighth Amendment cases a DOCCS medical provider will outline in a declaration the number of times a patient was seen by some sort of medical provider, creating the guise that the patient had been treated merely because there was interaction with health care staff.

134.    DOCCS decided to solidify these unconstitutional actions into the MWAP Policy.

**Development of the MWAP Policy**

135.    In 2006, Dinello was working as an emergency room physician in area hospitals and began working for DOCCS part-time as well.

136.    He soon ran into trouble.  In 2007 and 2008 he failed to treat patients in the Auburn Emergency Room before discharging them.

137.    Arguably in response to Dinello's malpractice issues, he started a company that offers drug-testing and evaluations of employees – services that do not require a medical license.

138.    He also started to pursue his "passion" for addiction issues, an area of medical practice for which he received no additional or specialized training.

139.    In 2010, the New York State Department of Health State Board of Professional Medical Conduct charged Dinello with three counts of failing to adequately evaluate patients prior to discharge from an emergency room.

140.    In Dinello's words he was, "accused of not ordering additional testing or prescribing medications for patients."

141.    Dinello plead guilty and was prohibited from practicing emergency medicine again and sentenced to three years' probation for the practice of non-emergency medicine, during which time he was to be monitored by another doctor.

142.    The Commonwealth of Pennsylvania followed suit and placed Dinello on probation with an adjudication and order dated May 5, 2011.

143.    Despite these very serious charges and adjudications, DOCCS named Dinello Chairman of its Pharmacy and Therapeutic Committee in which role he crafted policies and procedures and oversaw primary care guidelines for the medical providers of almost 50,000 patients.

144.    Unbelievably, Koenigsmann allowed Dinello to draft a new policy on Medications With Abuse Potential ("MWAP"), despite the fact that Dinello had no specialized addiction training, no pain management training, and was stripped of his emergency medical license for not properly evaluating or treating patients.

145.    Dinello wrote the policy in rough form in 2015 and Koenigsmann promulgated it on June 2, 2017.

146.    On September 10, 2018 Koenigsmann signed a revised version of the MWAP Policy.

147.    But there were earlier versions and efforts related to the MWAP Policy that

resulted in the discontinuation of a patient's effective pain or neuropathic pain management medication before June 2, 2017.

148.    Doctor Michelle Belgard, the Facility Health Services Director at Five Points, who worked directly under Dinello, testified under oath in 2016 that Dinello had already targeted Neurontin, Baclofen, Lyrica and any scheduled medications. She testified, "we no longer prescribe Morphine, Percocet, or [Ultram] . . . we are trying to remove those medications."

149.    Of Neurontin in particular she testified, "[Dinello] is currently trying to change the policy on the use of Neurontin to limit its use."

150.    Dinello has also testified under oath that "in the prisons I took care of, this was something I was already doing as a health care provider."

151.    In fact, the medical personnel in several facilities in Dinello's "hubs" tell patients repeatedly, "you cannot get that medication here," or "we do not use that medication," or "we do not give that."  This is especially true at Groveland, Franklin, Five Points, Elmira and Marcy Correctional Facilities – all controlled by Dinello.

152.    Certain RMDs and facilities started rolling out the MWAP restrictions and policy implementation well before the Policy was actually promulgated by Koengismann.

153.    The reports of Senior Utilization Review Nurse's ("SURN") conducted on the facility level between 2015-2018 show that the facilities were keeping track of how many patients were still taking medications such as Neurontin or narcotics and counting down month to month until the facility reached zero patients.  The reports show the systematic elimination of certain medications from prisons.

154.    In fact, Dinello started refusing approvals of the MWAPs on "Non-Formulary" Request forms from treating MDs and Mid-Level Clinicians in his HUBs as early as 2015.

155.    On March 23, 2017, Koengismann sent an email to all Facility Health Services Directors and Nurse Administrators and asked that they "provide this memo to all primary care providers."  He wrote, "The Division of Health Services will be issued a Health Services Policy regarding medications with abuse potential in early summer (does not apply to reception or classification centers).  This is in response to the devastating nationwide epidemic of substance abuse and addiction and is in accordance with AMA guidelines.  The policy will limit the use of controlled substances along with medications that have significant abuse potential within DOCCS.  The policy will also restrict where the patients can be housed. . . This notice is being sent in advance to allow providers to reevaluate patients on the medications and begin to make appropriate changes in anticipation of issuance of the policy."

156.    Accordingly, some providers in facilities not already targeted started discontinuing MWAP medications from patients regardless of need.

157.    Once the MWAP Policy went into effect, a provider would no longer submit a "Non-Formulary drug request" for a MWAP medication. She or he would submit an MWAP Request Form.

158.    Under the MWAP Policy, an MD or Mid-Level Clinician submitted the MWAP Request Form to the RMD in charge of his/her "hub."

159.    The MWAP Request Form asked for relevant health information regarding the patient, the justification for use of the medication and a list of any alternatives tried to treat the medical issue.

160.    The MWAP Request Form also asked if there is any recent evidence of drug diversion or abuse by the patient.

161.    To conduct a review of the MWAP Request Form, the RMDs had access to the

limited portions of the patient's medical history available on the DOCCS' FHS1 database, but rarely undertook even that review.

162.    RMDs did not have access to the patient's personal paper AHR which is kept at the facility where the patient is in custody.

163.    Based on the MWAP Request Form contents -- the RMD and not the patient's medical provider -- determined whether a patient will receive an MWAP.

164.    In 2018, under oath, Dinello was asked whether the MWAP Policy would force a facility doctor to discontinue MWAP medications that were effectively treating patients.

165.    Dinello responded, "That was up to them. That's the individual provider's prerogative, I assume."

166.    This response was categorically untrue.  MWAP was a "policy" and not a practice guideline.

167.    MDs and Mid-Level Clinicians within DOCCS had to discontinue an MWAP prescription if it was not approved by the RMD. The pharmacies would not fill a prescription for an MWAP without RMD approval.  An MD or Mid-Level Clinician had no ability to provide the medication once an RMD refused to approve the prescription.

168.    Koenigsmann testified under oath, "A policy requires adherence. A practice guideline is a guideline; it's a recommendation for care. . . The regional medical directors felt strongly that this should be policy, that it required adherence by the providers, not as guidance."

169.     Defendants knew the new MWAP Policy violated constitutional rights.

170.    In an internal DOCCS email to Dinello, Koenigsmann wrote, "[I]n discussions, grievance responses, et cetera, we need to be extremely careful about indicating that anyone is having their medication discontinued because of a new policy. Changing meds based on policy

is doomed to failure . . ."

171.    When asked if he meant, "doomed to failure legally," Koenigsmann responded, "I did mean that.  And I also meant that for the providers --- and this was my reservation originally for thinking of a practice guideline versus a policy, was it's difficult with licensed clinicians to dictate how they provide care. And this being a policy, we do require that they have to prove certain things before they're able to prescribe these medications, and that's different from out in the free world. There are not similar limitations on providers."

172.    Koenigsmann added the MWAP Policy was "never designed to eliminate any specific med, medication, or class of medication from its use. It was only to ensure that we have proper oversight over the clinicians ordering the medications."

173.    But the policy did not operate to create "oversight," it had the immediate impact of abruptly discontinuing the effective treatment of hundreds of inmates on MWAPs, including patients who suffered from epileptic seizures, Multiple Sclerosis, phantom pain, major spinal injuries, and other sources of chronic pain.

174.    Koenigsmann testified that it was possible that the MWAP policy could have the effect of discontinuing effective medical treatment to patients.

175.    In fact, many conscientious DOCCS MDs and Mid-Level Clinicians challenged the policy, especially the suggestion that patients with chronic pain issues should be treated with psychiatric medications to numb them and "drug them up."

176.    The current CMO of DOCCS, Dr. Moores testified under oath that approximately 80% of the DOCCS providers she spoke with opposed the MWAP policy.

177.    A review of the medical records of DOCCS' patients shows consistent patterns of medical providers fighting the RMDs when their patients were stripped of effective MWAP

medications. The MDs and Mid-Level Clinicians also attempted to exploit loopholes to get their patients necessary care.

178.    Under the MWAP Policy an MD or Mid-Level Provider could prescribe five (5) days of an MWAP medication without RMD approval.

179.    Medical providers within DOCCS sometimes used this five-day loophole to get patients in severe chronic pain at least five days of relief in facility infirmaries.

180.    Medical providers checked patients with chronic neurological or other chronic pain issues into facility infirmaries for "pain control," meaning the providers were administering the five days of pain management they could get without MWAP approval from an RMD.

181.    The truth was that after June 2, 2017 RMDs repeatedly and systematically refused the prescription or re-prescription of MWAPs to patients in desperate need of medications to effectively treat chronic pain, nerve, and other health issues, no matter the recommendations of treating providers and specialists, nor the patient's individualized medical needs.

182.    When patients asked their medical providers or submitted inmate grievances the responses were invariable that "Albany" had refused the prescriptions in accordance with 'policy.'

183.    Patients had no available avenue for appeal when their effective medical treatment was discontinued.  All methods of appealing unconstitutional medical care lead to an inevitable dead end that recommends the patient, "use the established sick call procedures" so he/she can go back and speak to the very provider that discontinued the medications.

**There is No Redress For A Patient When Effective Medical Treatment Is Discontinued or Denied**

184.    There are two direct possible avenues of redress for a suffering DOCCS' patient:

1) the inmate grievance system; or 2) letters to the Chief Medical Officer – written by the patients themselves, their legal advocates, or third parties appealing on behalf of patients, like state politicians and members of the clergy who work in the prisons.  These are both dead ends.

**The Inmate Grievance Program Is Unavailable**

185.    The Inmate Grievance System is established at 7 NY CRRR 700 *et seq*. and was intended to be "an orderly, fair, simple and expeditious method for resolving grievances…"

186.    However, the NYS Inmate Grievance System has not been timely administered in several years.

187.    A grievance is supposed to start at the facility's Inmate Grievance Review Committee ("IGRC").  An inmate files a grievance and it is heard by a facility IGRC.  If an inmate is dissatisfied with the IGRC response, he/she must then appeal to the Superintendent.

188.    However, it is the Inmate Grievance Program director who drafts the response for the Superintendent.  The very staff member who denied the grievance in the first place then drafts what is supposed to be the decision on the appeal from that very decision.  Once the Superintendent "renders a decision," an inmate must appeal the Superintendent's decision to the Central Office Review Committee ("CORC").

189.    Pursuant to 7 NYCRR 701.5, the CORC consists of seven high-ranking DOCCS' administrators or their designees, including a member of the Office of Counsel, charged with defending DOCCS from lawsuits.

190.    Pursuant to 7 NYCRR 701.5(3)(ii) "CORC shall review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the grievant, the grievance clerk, the superintendent, and any direct parties within thirty (30)

calendar days from the time the appeal was received."

191.    An inmate cannot file a cognizable lawsuit in federal court unless he has fully exhausted his administrative remedies and received a decision from CORC.

192.    Not one of those grievances has been answered by CORC within thirty (30) days. In fact, almost all of the grievances filed after 2017 were not even answered within a year.

193.    By way of example, Peter Allen filed a grievance that was received by CORC on November 17, 2017.  CORC rendered a response on January 30, 2019 – over fifteen (15) months later.

194.    Brian Bernard filed a grievance that was received by CORC on December 12, 2017.  CORC did not respond until January 23, 2019 – over thirteen (13) months later.

195.    Shannon Dickinson filed a grievance on March 9, 2018 that was not answered by CORC until August 7, 2019 – over seventeen (17) months later.

196.    Shannon Dickinson filed a grievance on April 11, 2018 that was not answered by CORC until October 2, 2019 – over eighteen (18) months later.

197.    Shannon Dickinson filed a grievance on April 16, 2018 that was not answered by CORC until October 9, 2019 – almost eighteen (18) months later.

198.    Shannon Dickinson filed a grievance that was received by CORC on July 31, 2018 that was not answered until October 2, 2019 – over fifteen (15) months later.

199.    Aaron Dockery filed a grievance on September 26, 2017.  CORC did not respond until January 30, 2019 – sixteen (16) months later.

200.    John Gradia filed a grievance on September 12, 2017; he did not receive a response from CORC until December 12, 2018 – fifteen (15) months later.

201.    Sean Pritchett filed a grievance on October 3, 2017; CORC did not render a decision until April 17, 2019 – almost eighteen (18) months later.

202.    Rashid Rahman filed his grievance on July 5, 2017; CORC did not answer until February 20, 2019 – over nineteen (19) months later.

203.    Plaintiff's counsel currently possesses over seventy (70) CORC responses to patients.  Not one was responded to in less than a year.

204.    In sworn testimony, Morley was asked, "[When a patient] file[s] a grievance, and let's pretend [his] pain medication has been discontinued and [he's] in a lot of pain, according to [him]. So [he] file[s] a grievance, but [he doesn't] get a response for 14 months; do you think that's an appropriate avenue for a patient to address what he perceives to be a pressing medical issue?  Dr. Morley answered, "No."

205.    And the delays will not improve.

206.    In a sworn declaration submitted in April of 2020 to Judge Sannes of the Northern District of New York, Rachel Sanguin, DOCCS' Assistant Director of the Inmate Grievance Program for DOCCS, stated, "During calendar year 2019, there were approximately 8,090 grievances appealed to CORC….the voluminous number of appeals, correspondence, and record requests received by CORC has contributed to the delay."

207.    Not one grievance regarding medication was found in favor of the patient.  Each and every response from CORC starts with the statement: "Grievant's Request Unanimously Accepted In Part" – yet, nothing the patient grieved was 'accepted,' addressed, or fixed.

208.    In fact, CORC uses that header, "Request Unanimously Accepted In Part," to then categorize the grievance as having been found "in favor" of the grievant.  This false labeling

is used to artificially inflate the numbers on DOCCS' Annual Grievance Reports.  DOCCS' Annual Inmate Grievance Reports for 2016, 2017 and 2018, respectively, suggest that 35.3%, 36.7% and 32.2% of grievances have been decided "in favor of the grievant," but that is not even close to the truth.

209.    Worse, all the medical grievance responses from CORC say the same thing. They start, "Upon a full hearing of the facts and circumstances presented in the instance case and upon the Recommendation of the Division of Health Services, the action requested herein is accepted in part."

210.    The grievance responses all continue, "CORC notes that the grievant's complaint has been reviewed by the Division of Health Services' staff, who advise that a complete investigation was conducted and he is receiving appropriate treatment."

211.    Then some responses contain a few notes specific to the patient which are nothing more than a rendition of the FHS1 provider entries from the last few months listing the times a grievant has allegedly met with health staff.

212.    In late 2018 and 2019 CORC started adding a segment about MWAP to some of the grievance responses, "CORC asserts that all inmates will have access to medically appropriate medications, and that the RMD is required to review and approve the use of potentially unsafe medications that have abuse potential as outlined in HSPM #1.24.  CORC continues to uphold the discretion of the provider to determine the type and necessity of medication administered and finds no compelling reason to revise HSPM 1.24 at this time."

213.    The provider, of course, had no discretion to determine the type and necessity of medications administered – only an RMD had that discretion under MWAP.

214.    Then each grievance ends, "With respect to the grievant's appeal, CORC finds

insufficient evidence of improper care or malfeasance by staff and advises him to address further medial concerns via sick call at his current facility."  Sometimes this sentence ends, "via sick call procedure."

215.    Every single grievance is denied in fact and then ends with a line that the grievant should go back to the very same medical providers who perpetrated the delay or denial of medical care in the first place.

**Patient Appeals to the Chief Medical Officer Do Not Work**

216.    Patients within DOCCS' care who require medical treatment can also write the Chief Medical Officer – currently Dr. Moores, but formerly Koenigsmann or Morley.

217.    Hundreds of patients each year and/or their advocates -- whether lawyers, family members     or     others     --     wrote     Morley     (before     late     2018 Koenigsmann) seeking the intervention of someone they perceived to be not only "in charge" but capable of helping them with their pressing medical needs.

218.    Just for the 110 patients, over one hundred advocacy letters were written to the Chief Medical Officer's Office by the patients themselves, lawyers from Legal Aid Society, Prisoners Legal Services, and smaller law firms, politicians, clergy members, and family members on behalf of patients injured by medication discontinuation policies and practices.

219.    Not once did the Chief Medical Officer intervene on behalf of a patient.

220.    In fact, in sworn deposition testimony Morley called the advocacy letters and requests for help, "complaints"…and "accusations" ….written because "things are not going the way [the patients] would like them to."

221.    Morley described the process, "so complaints will come into my office and I read

the complaint and then forward it on to the person who oversees the [Regional Health Services Administrators ("RHSA")] and they will contact the facility and respond to the complaints."

222.    Morley added, "I'll write a couple of notes and initial it at the top and forward it to the RHSA for resolution.  Sometimes I do that via e-mail, sometimes I do that just by passing it on to my secretary who then brings it to the person overseeing the RHSAs."

223.    Morley testified, "the process was passed on to me [by Koenigsmann] when I arrived that this is what we do . . . I just know that I've read the complaint and it needs a response and someone else is going to respond to it."

224.    Morley sometimes contacts the nurse administrator of the facility or the physician, the Facility Health Services Director "what are your thoughts on this case?"  But when he asks these questions, Morley testified that he never turns the responses over to the RHSAs answering the letters so they might help the patient.

225.    Dr. Morley testified under oath, "I can't think of anytime that anybody ever came back and said, "yes [the complaint has merit] they will – I think, I think 100 percent of the time the response is significantly different than the accusations that are in the complaint."[2]

226.    When asked if those very same nurse administrators or providers might have "an incentive not to tell the truth" about a patient's care, Morley replied, "any person is more than capable and has an incentive not to tell the truth."

227.    Even when Rabbi Frank Maxwell directly emailed Koenigsmann on behalf of Plaintiff John Gradia, the Rabbi communicated that Mueller had rejected the recommendation of the pain management specialist to prescribe 100mg of Ultram.

---

[2] To be fair, after a break and a conversation with his counsel Morley suddenly remembered, "a couple of cases where somebody identified an issue and there was a problem, yes."

228.    Koenigsmann dismissively replied, "This patient is under the care of pain specialists and has a future appointment scheduled.  Ultram is an addicting agent which is not appropriate for long term management of pain syndromes as is the trend in the community.  The focus of pain management is not complete pain relief but to regain and maintain function.  If the patient is able to carry out his activities of daily living that is successful treatment."  Mr. Gradia was receiving no relief and the lack of treatment was substantially affecting his activities of daily living.

229.    Plaintiff's counsel possesses almost 100 letters from the Chief Medical Officers to patients who lost their effective medication and appealed to the CMO for help.  In **EVERY SINGLE RESPONSE** whether to lawyers, family members or the patient, no help is offered and the letter ends the exact same way: "It is suggested that [you/patient] continue to bring [your/his] medical concerns to the attention of the health care staff using the existing sick call procedure.  I am sure they will make every effort to address [your/his] needs."

230.    Letters to the Chief Medical Officer are nothing more than a dead end for patients requiring help with pressing medical needs, including the discontinuation of effective pharmaceutical treatment.

231.    Unfortunately, letters to outside agencies requesting help on behalf of a DOCCS' patient are just forwarded to the CMO for the same treatment.

**Koenigsmann and Morley Utterly Failed To Respond To Bona Fide Complaints of Patient Suffering Due to MWAP**

232.    Despite years of complaints, concerns, and public comment on the devastating impact MWAP was having on patient care, Chief Medical Officers never did anything to correct it.

233.    On October 30, 2017 the New York State Assembly Committees on Health and Corrections had a public hearing on "Healthcare in New York Correctional Facilities."

234.    Both Commissioner Annucci and Koenigsmann were present for the proceedings.

235.    Annucci himself testified that the top grievance at Albion Correctional Facility was for discontinuation of Neurontin which he erroneously labeled "an extremely dangerous opioid." [3]

236.    Koenigsmann added the medical grievances that year focused on "[patients wanting] a specific medication over another, want[ing] a specific provider over another...."

237.    At the same hearing, Stefen Short, Esq. of Legal Aid Society's Prisoner Rights Project testified about the devastating impact MWAP was having on patients.

238.    Mr. Short started, "blatant skepticism [results in] a failure to exercise competent medical judgment, manifest by the failure of staff to order care recommended by specialist, undue influence by security personnel, and arbitrary reversals of treatment decisions upon facility transfer…"

239.    Mr. Short continued, "we are concerned that [MWAP} has resulted in blanket denials of certain prescription medications without patient centered assessment of prognosis, need or alternative treatment….to that end, we call on the department to review its implementation of policies regarding pain medication to ensure that patient centered determinations are being made and patients pain is adequately treated."

---

[3] It is of note that Annucci had already read this Court's injunction issued in the related case *Medina v. Buther, et al.,* 15-cv-1955, as the Court ordered Defendants' counsel to deliver the decision to him at an April 13, 2017 pre-trial conference. And, of course, Neurontin is not an opioid.

240.    In fact, no one at DOCCS, including the Koengismann, did anything to help patients.

241.    Morley has testified that no data was ever culled, no audits were conducted, and he NEVER SPOKE WITH EVEN ONE PATIENT.  This bury head in sand leadership style meant injury to hundreds, if not thousands, of patients.

242.    Despite hundreds of letters to the Chief Medical Officers, hundreds of grievances, hundreds of letters from legal advocates, public testimony, and the SDNY's various decisions in *Medina II*, no one at DOCCS ever revisited the MWAP policy or its harmful impact on patients.

243.    In fact, just the opposite occurred.  Good doctors who stood up for their patients were demoted, berated in emails, denied the ability to treat their patients, constructively fired and several took early retirement.

244.    By far, the most vulnerable and at-risk patients are housed in Regional Medical Units ("RMUs").

245.    Chronically and terminally ill patients are transferred to RMUs because they cannot care for themselves and/or require constant medical attention.  Many are transferred to RMUs for palliative care.

246.    Patients in an RMU have a "treatment team" consisting of nurses and doctors who provide for their medical needs and follow their cases.  The treatment teams meet on a regular basis to discuss the patient's case – including progress, needs and appropriate medication.

247.    MWAP destroyed the ability of treatment teams and medical providers at RMUs to treat their chronically and very seriously ill patients effectively.

248.   A team of very well-trained doctors working at the Walsh RMU vocally and actively advocated for their patients when Dinello started refusing and discontinuing MWAP prescriptions for their very ill patients.

249.   In late 2016, when Dr. Robert Burdick, a physician at the Walsh RMU, started challenging Dinello's refusals of Non-Formulary requests, Dinello had him transferred to Marcy Correctional Facility.

250.   On February 10, 2017 Dinello sent Dr. Burdick a taunting email, "I trust you are adjusting to your new role as a physician in a Medium Facility.  Please keep in mind that Marcy CF is not like the Walsh RMU…. The use of controlled/scheduled and restricted medications like Neurontin, Flexeril, Baclofen are used very sparingly…I will be releasing an introduction to the new Health Services 1.24 Medications with Abuse Potential (MWAP) Policy soon…. Most facilities are already transitioning their patients off of these medications…also, given that the acuity [in Marcy patients] is much lower, there is less of a need to order numerous testing and follow-ups.  The majority of the care [at Marcy] is primary in origin which is something you are well versed in.  In addition, the physicians at Marcy CF and other similar facilities have been encouraged to handle most of the day to day themselves. … For some providers it is taking time to adjust but for the most part they are doing just fine.  I am sure you will as well…. I believe the environment at Marcy CF should be fairly relaxing in comparison to your previous assignment. … Have a great weekend!"

251.   The message was clear.  If you challenged Dinello or his new policy, you would be removed and/or demoted.

252.   Burdick was undaunted and continued to challenge Dinello when he felt it was in the best interests of his patients and their care.

253.   Remaining doctors at Walsh RMU, including Dr. Michael Salvana, the Medical Director, Dr. Stephen Smith, Dr. Kesava Potluri, and Dr. Subbaro Ramineni, all fought the MWAP Policy and Dinello's unwarranted restriction of medications for truly sick patients.

254.   On June 8, 2017 Amy Tousignant, then Deputy Superintendent of Healthcare at Walsh, wrote Dinello and cc'd all the members of the Walsh RMU team.  She requested an exception for the RMUs given the severity of patient medical needs and the time it took to complete the forms.  She cautioned, "Patients will suffer in pain and finally the nurses are being placed in a tough spot to address the medication needs not being met."

255.   In July of 2017, Dr. Salvana wrote a detailed letter to Assistant Commissioner Charles Kelly, Executive Assistant to Commissioner Annucci, about the catastrophic suffering of patients at Walsh RMU for whom Dinello denied MWAPS, including: 1) an inmate with epilepsy who…was well controlled with Neurontin.  He had been on Neurontin for over 10 years but Dinello denied it and suggested the use of medications that had been tried and failed; 2) and inmate with sickle cell anemia with necrotic hip and shoulder joints who almost died during a sickle cell crisis and was denied morphine and Neurontin; 3) a patient with severe chorea, as a result of being treated with L-Dopa for Parkinson's disease was denied Ativan by Dinello.  Ativan was the only medication that effectively treated his uncontrollable movement.  Since the medication was stopped, the patient had been found falling out of bed and could not care for himself; 4) an innate with epilepsy who was denied Vimpat on multiple occasions.  Finally, after three hospitalizations Dinello finally approved the medication; 5) an inmate with T-7 vertical fracture was denied a low dose of as needed percocet to control his pain; 6) an inmate with cerebal palsy and spinal deformity was also denied a low dose of percocet for pain control; and others.

256.   Dr. Salvana also mentioned patients with diabetic neuropathy with positive EMGs who could not get Neurontin to control their neuropathy.

257.   When Koengismann saw the letter, he emailed Dinello, "Apparently, Walsh RMU has elevated their MWAP issues to the HUB superintendent who, in turn brought them to the Commissioner.  I need you to comment on each of the attached cases so I can respond to the inquiry."

258.   Nothing substantial came of the concerns of the Walsh RMU staff – they were ignored.

259.   The MWAP Request forms from Walsh RMU doctors show that Dinello categorically denied MWAP Requests unless the patient was palliative (or near death).   In response, doctors started adding, "Patient DNR," "patient dying ca[ncer]," just to get simple medications.

260.   Still, Dinello denied MWAP Requests for patients with "end stage COPD," urothelial cancer that had metastasized, late-stage AIDs, lung cancer that had metastasized and other painful disease and conditions.

261.   In August of 2017, Mary Koury, DOCCS Statewide Director of Pharmacy Services, wrote an email to Dinello, Koenigsmann, and Joan Smith who served alongside Koenigsmann memorializing notes from a meeting with doctors regarding MWAP.  She noted, "Many reports of push back from MDs…lots of potential litigation.  Some already seen especially in situations where a specialist has ordered an MWAP drug.  In general most reported being all for it for general population….[but] question feasibility in RMU setting especially in terms of chronically ill patients."

262.   Koengismann and Dinello did nothing for the RMU patients.

263.    In September of 2017, Dr. Stephen Smith fought back when Dinello discontinued Neurontin for one of his patients.  He wrote, "Since 1200 mg is working in this individual and ortho suggested [it], why do you want me to wean him off?  You suggest pain management but they are only going to tell me to place him on meds for pain control….from your printout on medications to use for neuropathic pain, I am cutting and pasting the reference to Neurontin below….The above is directly from the article you sent us.  So, if I wean the inmate off the Neurontin, he will again be in pain.  Plus, sending him to pain management will only get us with another RX for pain meds."

264.    In October of 2017, Dr. Salvana demanded a meeting with Koenigmann out of his great concern for the patients.  He prepared a list of patients and their unfilled medication needs due to MWAP.  In anticipation of a meeting, he sent his list to Koengismann.

265.    Dr. Salvana wrote, "I am contacting you before your planned visit on November 1, to let you know that the MWAP policy at Mohawk and Walsh RMU continues to create significant problems in the management of our patients and in administering proper community standards of care. This involves all of our medical doctors who are all internists, most of whom have done additional training."

266.    Dr. Salvana then detailed Dinello refusing prescription of Percocet because, "'the continuation of opiate analgesia for this chronic non-palliative issue will make post-operative pain management extremely difficult."  This statement from Dr. Dinello is nonsense and as a result the patient suffers…if you disagree with this then perhaps we can consult an outside agency, who can reassure us that we are giving proper care."

267.    Koengismann responded, "I feel that the MWAP process is critically important to DOCCS to be in line with what is occurring in the community to get control of the opioid overdose

and abuse crisis. … except for expanding the limitations to some highly abused non-opiate medications nothing in the MWAP is outside of the DOH and national recommendations for prudent opiate use.  Regardless, we are coming to the facility to both see the new RMU expansion and have an opportunity to speak with you and the providers…The meeting on Wed is not appropriate for specific patient issues rather a more general discussion regarding the MWAP policy."

268.    Of course, at the meeting Drs. Salvana and Potluri pressed the case for their patients, going through the dossiers they had assembled and explaining the impact on patient health.  Dinello sat with his arms crossed and a scowl on his face through the meeting.

269.    Koengismann did nothing for the patients.

270.    In late December Dinello wrote a threatening e-mail to Walsh RMU staff that stated in part, "After reviewing records and talking with nursing/pharmacy staff it appears the MWAP policy is not being followed.  …At the latest census, the RMU has 137 patients with the FHSD [Salvana] seeing 10 patients and the rest seeing 31 patients.  As per policy 1.24 a MWAP Request form needs to be sent for each medication listed.  This needs to then be sent to the RMD for review.  Any question regarding the RMD decision needs to be discussed with the reviewing RMD…..In the future…. I will be reviewing adherence to the MWAP 1.24 policy….Consider this an "informal warning" and that from this point forward a "formal warning" will be issued if the Policy is not followed.

271.    In January of 2018 there was yet another phone conference with Dinello, Koenigsmann, and Salvana.  Once again, Salvana attempted to help the patients in RMUs.  This, too, failed.

272.   Dinello then enlisted the new Deputy Superintendent of Health and Nurse Director to start harassing the non-compliant doctors.

273.   The Nurse Director told her nurses not to assist the doctors with their rounds or with certain tasks related to patient care.

274.   One day Dr. Potluri, a very good and conscientious doctor, walked out of the Walsh RMU not to return.  He was done.

275.   Drs. Smith, Ramenini, and Burdick "retired."

276.   Dr. Salvana was demoted and assigned to a facility four hours round-trip from his home.

277.   When he applied for a position to replace the Facility Health Services Director at Cayuga, a facility near his home, Dinello personally called Dr. Salvana to tell him he was filling the position with a nurse.

278.   As Dr. Salvana could not endure the four-hour daily commute, he "retired."

279.   Dr. Salvana wrote Morley on several occasions regarding the issues with Dinello and MWAP.

280.   In an April 2020 letter Dr. Salvana detailed to Morley Dinello's licensing issues and the utter failure of MWAP, "a policy that has harmed inmates."

281.   As usual, Morley did nothing.  Under oath, he testified that when he learned of Dinello's medical license suspension and revocation, he did not look into it.

282.   Meanwhile, patients in RMUs, many of whom are too sick to communicate or write counsel, continued to suffer.

283.   In February of 2021, as a direct result of class action litigation, DOCCS finally rescinded the MWAP Policy and promulgated a new policy 1.24A "Prescribing for Chronic Pain."

284.   The new policy demanded "Pain management medication should only be discontinued after a provider has met with the patient, discussed the issues regarding the use of the medication, analyzed the patient's situation, and subsequently determined that it is in the best interest of the patient for the medication to be discontinued.  The discussion with the patient and the reasons for discontinuation of the pain medication will be recorded in the AHR."

285.   Of course, in many, many cases this did not happen.  DOCCS never trained the 150+ providers in 44 facilities on the new policy or how or why it was implemented.  Medication discontinuations and denials based on nothing more than the nature of the medication continued.

286.   Providers and nurses continued to tell patients, "we don't give that medication here" when patients transferred in and they continued to discontinue effective medications for non-medical reasons.

287.   Again, DOCCS administrators sat by and watched the constitutional violations.

**Plaintiff's Experience**

288.   Mr. Reyes is a 47-year-old patient currently housed at Green Haven Correctional Facility ("Green Haven").

289.   Mr. Reyes suffers from sickle cell anemia.

290.   Sickle cell is a hereditary disease that limits the number of healthy red blood cells carrying oxygen through the body.  The blood cells are shaped like sickles or crescent moons and they get stuck in small blood vessels, slowing and blocking blood and oxygen flow to parts of the body.

291.   Patients with sickle cell suffer from "crises" or exacerbations of pain that can last hours or weeks.  Treatment includes strong pain medication, often opioids, and blood transfusions when crises are at their worst.  Many sickle cell patients start opioid therapy at a

very young age.  The prognosis for a sickle cell anemia patient is very grim with an average age of death in the early 40's.

292.   Due to his sickness, Mr. Reyes suffers from frequent crises that necessitate hospitalizations.  Like most sickle cell patients, he also takes Hydroxyurea.  In some patients, Hydroxyurea can reduce the number of crises a patient suffers because the medication helps blood cells stay rounder and more flexible by increasing hemoglobin F, but Hydroxyurea does not treat pain and related symptoms.

293.   As early as 1998 Mr. Reyes was taking a consistent treatment of folic acid, vitamins and Percocet when he was not in crisis in DOCCS' facilities. He generally suffers from 5-6 crises per year requiring hospitalization.

294.   In October of 2001 hematologists were already recommending a protocol of aggressive fluids and pain medication to prevent or reduce admissions to Albany Medical Center for crises.

295.   In 2002, he was accused of hoarding OxyContin and the doctor at Walsh RMU switched him to liquid administration. Dr. Daniel Bellino at University Hospital immediately ordered that Mr. Reyes' OxyContin prescription be renewed.

296.   In 2003, Dr. Susan Lemke ("Dr. Lemke"), a hematologist and oncologist at University Hospital suggested OxyContin 60 mg as a "chronic dosing." DOCCS' medical staff insisted on 10mg despite Mr. Reyes' complaints of chronic pain.

297.   From March of 2001 to March of 2010, Mr. Reyes was hospitalized at least 32 times with sickle cell crises.  His hospitalizations lasted from between five days and four weeks.  During that time, he was followed by Dr. Lemke. Dr. Lemke repeatedly endorsed and recommended treatment with 80 mg of oxycodone either twice or three times a day.

298.   During the same time period, Defendant Dinello repeatedly filled requests for the same prescription for Mr. Reyes while he was a doctor at Cayuga Correctional Facility where Reyes was housed.

299.   In March of 2010 Mr. Reyes was released on parole.

300.   Unfortunately, Mr. Reyes was returned to custody in April of 2015 and housed at Green Haven.

301.   At Green Haven, Mr. Reyes immediately started having problems getting the treatment he needed.

302.   On April 29, 2015, Mr. Reyes suffered a crisis and spent eight days in the hospital.

303.   When he returned to Green Haven, on May 15, 2015, Edwin Quinones, a nurse practitioner, stopped Mr. Reyes' pain management protocols.

304.   During this time, Defendant Mueller was undertaking an aggressive plan to restrict all narcotics from prescription at Green Haven.  A "Narcotics Review Committee" was formed ostensibly to review the cases of patients currently on narcotics.  Dr. Stephen Weinstein a physiatrist on the committee testified under oath that eventually Defendant Mueller just started saying no even if the committee felt a patient needed medication.

305.   The problems at Green Haven with diversion were mainly undertaken by staff members.  One nurse was found to have diverted over 9900 percocet pills from the Green Haven clinic.

306.   Nursing staff from Central Office started tracking which patients were still on narcotics or Neurontin and how many they had managed to discontinue – it was a numbers game not a program geared toward optimizing patient care.

307.   On June 30, 2015, Nurse Administrator Osselmann told Reyes that his "medication was weaned and discontinued based upon the recommendation of the pain management committee.  The committee reviewed the documentation in your chart and determined that the medication was no longer needed."  The committee had made no such recommendation; Mueller had.

308.   Mr. Reyes never met with a member of any pain management committee, nor was he ever examined or interviewed about his pain, history of crises, or need.

309.   In July, Mr. Reyes was finally seen by Dr. Ahmed Asif, a hematologist/oncologist. Quinones suggested in the referral, "Previously on morphine.  Has tolerated taper well.  Receiving Motrin with good response." These statements were totally untrue.

310.   Dr. Asif's notes are not in Mr. Reyes' chart, but two days later Mr. Reyes was taken to the emergency room in a crisis. The medical staff at Putnam Hospital re-prescribed Morphine 60mg twice per day.

311.   On August 18, 2015, Mr. Reyes was taken to the hospital again, this time for two weeks.  On discharge he was diagnosed with anemia due to blood loss, fever, hyperuricemia and sickle cell anemia with crisis.  He was put back on 60 mg twice per day of MS Contin, but Green Haven medical staff very quickly tapered him down in early September.

312.   When Mr. Reyes grieved the lack of adequate medical treatment and potentially avoidable crises, CORC only responded with a list of times he was seen by his provider that they gleaned from the FHS1 system.

313.   In October of 2015, Mr. Reyes was again at Putnam Hospital in crisis. When he returned, Dr. Clark at Green Haven quickly tapered Mr. Reyes off his morphine.

314.   On November 6, 2015 Dr. Asif saw Mr. Reyes again and directed the facility in his consultation notes, "continue Exjale daily – please make sure patient gets MS Contin 60mg every 12 hours and Motrin 600mg every 6-8 hours in between." The FHS1 entry memorializing Dr. Asif's recommendations says only, "PRN." The FHS1 entries make no note of recommendations for medication.

315.   On November 9, 2015 Mr. Reyes had another crisis.

316.   Mr. Reyes wrote Dr. Frederick Bernstein, then Facility Health Services Director at Green Haven, requesting that Dr. Asif's recommendations be followed.  Dr. Bernstein gave the pro forma response, "Per DOCCS procedures, outside specialists evaluate patients and make recommendations.  Those recommendations are evaluated by the patient's primary care provider, and that primary care provider, using his medical judgement and considering the recommendations of the outside specialist, makes the medical decisions regarding ongoing medical care."

317.   Finally, after yet another hospitalization, Mr. Reyes was finally represcribed 60mg of MS Contin.

318.   In February and June of 2016, Mr. Reyes suffered two more crises and hospitalizations, but at least four months apart.

319.   In August, Mr. Reyes saw Dr. Asif again who noted that his pain control was good on 60 mg of morphine every 12 hours.

320.   In late August of 2016, Mr. Reyes had another crisis hospitalization.

321.   Dr. Silver at Green Haven maintained Mr. Reyes on 60mg of morphine pursuant to Dr. Asif's recommendations.  Despite this treatment, in late August, another crisis ensued and another in November, though at least there was a two-month reprieve between crises.

322.    In December of 2016 and January of 2017, Dr. Silver noted that Mr. Reyes was doing ok on his current medical regimen, including 60 mg of morphine twice per day.

323.    In February, March and April of 2017, Mr. Reyes was hospitalized again with crises.

324.    In April, Dr. Asif noted while Mr. Reyes was in the hospital that his crisis was "refractory to current doses of pain meds." In sum, it was very hard to manage Mr. Reyes' pain on his then dosing levels.

325.    At a June 2, 2017 appointment Dr. Asif noted that Mr. Reyes was doing well and to continue MS Contin 60mg every 12 hours with Motrin 600 as needed. Again, the corresponding entries on the FHS1 system do not mention Dr. Asif's recommendations for medication.

326.    One June 1, 2017 DOCCS promulgated the MWAP Policy.

327.    On June 7, 2017 Dr. Silver submitted the first MWAP Request form for Mr. Reyes' MS Contin prescription. With seemingly no knowledge of Mr. Reyes' need for maintenance pain treatment, Defendant Hammer made Silver resubmit the prescription saying, "My general rule in prescribing any opiate medication is to make it PRN [as requested].  This puts the burden on the patient to request analgesia if he needs it." When Silver resubmitted the MWAP request, Defendant Hammer responded, "[p]lease confirm diagnoses that this is [sickle cell] disease, not trait.  Consider the appropriateness of this patient being in GP.  Try to engage the patient in a plan to lower the dose over time."

328.    Defendant Hammer had obviously not reviewed Mr. Reyes' records and history of over 44 hospitalizations for sickle cell crises.  He had not even opened the FHS1 database.

329.    On June 19, 2017 Mr. Reyes was taken to the hospital again.  Upon his return to

Green Haven, Dr. Silver submitted another MWAP Request to Hammer.

330.   Defendant Hammer responded, "Cases like this one can be difficult.  This patient would clearly be addicted at this point and any attempt to discontinue the opiate would certainly be met with resistance.  I would suggest a discussion with the patient to suggest dose reduction and insist on prn use going forward...the mentioned allergy to Toradol could be real or simply expedient to limit choices."

331.   Mr. Reyes wrote Defendant Robert Bentivegna, the facility health services director, out of concern that his medications would be stopped.  Bentivegna responded, "Dr. Silver is correct, you[r] medication will need to be approved by the Regional Medical Director on a monthly basis."  In effect, Mr. Reyes' medical care was being handled by Defendant Hammer, a man who had never even seen Mr. Reyes nor reviewed his medical records.

332.   In August of 2017, Defendant Ashong covered for Dr. Silver and submitted the MWAP Request to Defendant Dinello. Defendant Dinello discontinued the medication Mr. Reyes had been taking for at least 18 years stating, "The use of opiates will need to be reserved for acute exacerbations of sickle cell disease or end-stage hospice care."  Dinello did not exam Mr. Reyes or conduct an individual assessment before denying the medication.

333.   When Mr. Reyes appealed to Defendant Bentivegna he responded, "I understand your concern.  I ask you to understand that long term use of narcotic mediations is controversial for any condition.  I have no doubt that in the situation of a sickle cell crisis, narcotics would be used short term."  Short term use would not treat Mr. Reyes' chronic pain nor keep him out of the hospital.

334.   When Defendant Bentivegna presented Mr. Reyes' concerns about his treatment to Defendant Dinello, he responded, "I am sure he is well aware of the Health Care Crisis we

are facing in America (and the World)."  Defendant Bentivegna never individually assessed Mr. Reyes for his individual needs nor did Dinello.

335.   Mr. Reyes, of course, suffers from sickle cell anemia – a chronic and extremely painful disease – he is not a drug addict; he is a patient.  Dinello and Bentivegna cut off a man's sickle cell treatment because of a "crisis" that had nothing to do with Mr. Reyes' medical needs.

336.   There was no discussion of Mr. Reyes' needs for functionality and pain management, only allusions to a world-wide problem for others not suffering from sickle cell disease.

337.   When Dr. Silver approached Defendant Dinello via email, Silver advocated for his patient, in part, stating, "He has been receiving MSSR 60 mg twice daily for a long time, and this has worked fairly well for him over the past couple of years….Mr. Reyes' medical conditions are known to cause chronic, often severe, pain and he has benefitted from this treatment for many years.  I believe that this medication has prevented him from requiring more outside medical care, as well as permitting him to function with a reasonable degree of comfort within the facility.  Mr. Reyes has not abused his medications, has not, to my knowledge, shared or sold his medications, and has always behaved responsibly with respect to coming for, and properly taking, his medications.  He comes to the clinic when scheduled, behaves in a respectful manner, and I do not feel he is getting and secondary gain from taking MSSR."

338.   In response, Defendant Dinello lied.  He stated that he knew Reyes had a substance abuse problem from when he was the Facility Health Services Director at Cayuga years before.

339.   In fact, as a provider, Defendant Dinello consistently prescribed Mr. Reyes 80 mg of MS Contin three times a day.  He also never characterized Mr. Reyes' need for treatment as substance abuse in Mr. Reyes' charts.  To defend his policy, Defendant Dinello lied to the detriment of a patient who truly needed opiate analgesia.

340.   Pursuant to Defendant Dinello's MWAP denial, Dr. Silver started to wean Mr. Reyes of his needed and effective pain medication.

341.   On August 26, 2017 Mr. Reyes was back in the hospital suffering from a crisis. When he returned to Green Haven from the hospital, Dr. Silver noted, "one of multiple IPC admission for this 42-year-old male with sickle cell disease who returns to Green Haven after 2 week stay at Putnam Hospital for sickle cell crisis."

342.   When Dr. Silver discharged Mr. Reyes back to his cell on September 12, 2017 he noted, "continue MSSR 60 mg taper unless approved to continue MSSR at current dose." Silver then approached Defendant Hammer, the RMD for Green Haven.

343.   Defendant Dinello convinced Defendant Hammer that he knew Roderick Reyes and that he had a history of substance abuse.  Dinello had not treated or even laid eyes on Mr. Reyes in seven years. Defendant Hammer explained to Dr. Silver, "Patients with addiction to opiates can be very persuasive and convincing.  It is often very difficult for a clinician to differentiate the patient complaints especially when underlying medical issues coexist…" Defendant Hammer did not check Mr. Reyes' records himself, conduct an individual assessment, examin Mr. Reyes or inquire into his pain and functionality.  Again, Mr. Reyes' medications were denied and the taper continued.

344.   In fact, the only doctor with the training and knowledge to recognize addition was Dr. Silver.  Not only had Defendants Dinello and Hammer not laid eyes on the patient, but

they had no knowledge of appropriate treatment or any real addiction training.

345.   Mr. Reyes filed a grievance and specifically addressed the fact that the reasons for stopping his medications were "all general not towards my medical condition or me, myself."

346.   Mr. Reyes also pointed out that the reasons for rejecting Dr. Asif's recommendations were not recorded in his records. Reyes explained that he barely had a relationship with Defendant Dinello and would invite anyone to go over his files. The grievance fell on deaf ears.

347.   In late October of 2017, Mr. Reyes was back in the hospital with a crisis. Montefiore discharged him recommending 60mg of MS Contin every 12 hours. When he returned, Dr. Silver again approached Defendant Hammer about Mr. Reyes' medications.

348.   Defendant Hammer again refused the prescriptions without examining Mr. Reyes or conducting an individual assessment.

349.   In December, Mr. Reyes was back in the hospital. Upon discharge, hospital specialists noted that he needed to "continue pain management. Pain Control."

350.   On January 5, 2018 Dr. Asif saw Mr. Reyes and noted, "says that he's being weaned off from 60 mg BID to 30 mg BID.  Recommend continue his original dose at 60 mg BID to keep him from going to the hospital.  For breakthrough pain use Motrin 800 mg PO TID PRN. Again, the corresponding FHS1 entry only says, "RTC X no [follow-up] indicated. Recommend labs every month."  Again, the medical records system failed.

351.   When John  Morley was asked under oath whether the FHS1 entry accurately reflected Dr. Asif's recommendation Dr. Morley stated, "No….clearly there is a disparity between the electronic health record and this."

352.   Later that month, Mr. Reyes suffered another crisis and hospitalization.  Before Mr. Reyes returned to Green Haven, Dr. Silver, once again, tried to get Defendant Hammer to agree on treatment with MS Contin 60 mg per day.  Once again, Hammer denied the request saying, "I want to avoid the trap of placing these patients on standing daily morphine.  The inevitable result is addiction, psychological dependence and opiate tolerance, so that when a real crisis occurs, much larger than usual doses might need to be employed…."   Hammer did not examine or conduct and individual assessment of Mr. Reyes when denying the medication requested by Silver.

353.   This statement was not based on the standard of care for patients like Mr. Reyes who suffer from severe sickle cell anemia.  Many such patients are dependent on opioids by necessity.  It is how they survive.

354.   When Mr. Reyes returned from the hospital, Dr. Silver prescribed only 45 mg of MS Contin for five days and an aggressive weaning schedule.

355.   On January 30, 2018 Dr. Silver saw Mr. Reyes.  Mr. Reyes inquired on the denial of his MWAP requests and Silver said he could only find 2 MWAP forms on his computer.  He continued the taper.

356.   In February, Mr. Reyes was back at Montefiore with another crisis; when he returned Dr. Silver reinstated the aggressive taper from 45 mg once per day down to nothing, despite the discharge instructions that Mr. Reyes be maintained on 60 mg of MS Contin every 12 hours.

357.   In March, Mr. Reyes was back in the hospital again.

358.   In April, when Mr. Reyes returned from the hospital he submitted a very detailed grievance explaining how the denial of effective amounts of his chronic pain medication

caused him far more frequent hospitalizations than normal and daily pain and suffering.

359.    Mr. Reyes was readmitted to Montefiore on April 13, 2018. Instead of

hospitalizations and crisis every 2-3 months, Mr. Reyes was being readmitted to hospitals

every month.

360.    In response to Mr. Reyes' April grievance, Nurse Administrator Carey engaged

in the all-too-frequent deny-and-divert response.  She opined, "the patient should not need pain

medication through his stable periods…the request for consistent pain medication is denied.

His management of pain is based upon clinical data and findings.  The provider is well versed

in his care.  The provider also has the resource of the Facility Medical Director (Bentivegna)

and Regional Medical Director (Hammer) to assist with his plan of care."

361.    Carey did not identify the "clinical data and findings" that were relied upon.  A

simple review of Mr. Reyes' records would show more frequent hospitalizations since Mr.

Reyes' chronic pain medication was denied.  Any examination of "clinical data and findings"

would also show that every outside provider who treated Mr. Reyes recommended chronic

pain management of 60mg of MS Contin twice daily, including his "provider," Dr. Silver.

362.    Mr. Reyes was back in the hospital on April 29, 2018; he returned on May 7,

2018 to yet another taper order by Dr. Silver.

363.    It was not until early May of 2018 that Defendant Hammer finally called Dr.

Asif, Mr. Reyes' treating hematologist/oncologist. Hammer reported to Defendant Bentivegna

via email, "I spoke with Dr. Asif.  He feels that SS patients should be maintained on chronic

opioid analgesics for various reasons, chronic sickling, chronic low pain level, etc.  I don't

disagree in principle.  He mentioned a dosage of 60 mg MS Contin twice per day as being

reasonable.  No additional.  If the patient is adequately controlled at 45 mg bid then I would

recommend to continue at that dosage.  Hopefully, we should see a decline in the frequency of hospitalizations."

364.    Defendants Hammer and Bentivegna had tortured a sickle cell patient for over a year without speaking with the very specialist in charge of his care.  In an unbelievable show of patient disregard, Bentivegna responded, "Of course you know the guy will be looking for more, but at least we can say we made a good faith effort."  Hammer responded, "Dr. Asif suggested not to exceed 60 mg bid.  If the patient seeks more, then it's time to consider abuse. I would try to reach a rapport with the patient, but don't exceed 60 mg bid, and no in betweens."  Defendant Bentivegna finished, "Ha. I am already considering abuse, but let's see what happens.  I am not going to share this with Dr. Silver, or he will be on 60 mg right off the bat.  Let's try 45 for now and see how it goes.  Dr. Asif is a very nice and caring fellow, but sometimes I don't think he realizes the conditions we are working in.  But community standard and all that."

365.    Dr. Asif had not only been treating Mr. Reyes for years, he also treated him at each and every admission to Montefiore where he is on staff.

366.    Finally, on May 8, 2018 Defendant Hammer approved the MWAP and wrote, "Dr. Silver, I had a discussion with the hematologist, Dr. Asif.  I would agree with him that it would be reasonable to maintain Mr. Reyes on a chronic regimen of opioid analgesics without increases or decreases.  I agree with your regimen of 45 mg po bid and suggest try to limit fluctuations."

367.    Limiting Mr. Reyes' prescription to 45 mg instead of the 60 mg recommended by his hematologist and hospital staff served no legitimate medical purpose.  None.  In fact, Hammer and Bentivegna affirmatively kept the community standard information from Mr.

Reyes' provider, Dr. Silver.  MWAP was about control, not patient care.

368.    With at least consistent dosing Mr. Reyes did not suffer another crisis until August 19, 2018 when he was admitted to the hospital with acute kidney injury, pneumonia and a sickle cell crisis.

369.    The next crisis was not until late November, though his daily pain levels were high and he was in chronic pain that was historically alleviated at 60 mg.

370.    In another staggering display of how the MWAP policy did not accommodate individualized needs or assessments, Dr. Silver's November 2018 MWAP request for Mr. Reyes' medications was reviewed by Defendant Bozer, an RMD from another part of the state. She would only approve the medications for 30 days and emailed Dr. Silver, "I recommend a complete review of pain management in this patient to limit the use of chronic opioid use.  I note the patient is no longer on hydroxyurea nor on L-glutamine, both known to decrease the number of painful crises.  Non-opioid therapy has also proven beneficial including drugs for neuropathic pain.  Short acting opioids can be used on a[n as needed] basis….. it is to be noted that this patient has a known hx of substance abuse and has a "drug ticket" (although remote) for diverting his prescribed prescriptions.  This fact alone should not prevent him from getting appropriate pain management; however should give some pause for thought." Bozer did not review prior MWAPs, did not review the patient's records, did not examine or conduct an individual assessment of Mr. Reyes, and certainly had no knowledge of his medical history.

371.    In late November, Dr. Silver requested that Mr. Reyes' medication be administered in liquid form.  Defendant Hammer responded, "if this is being done because of a known cheeking attempt on the part of this patient then per policy we must stop the medication."

372.   Dr. Silver responded that there were no known incidents.   Hammer was ready to stop effective pain management for a patient suffering from chronic sickle cell disease over nothing more than a reported cheeking incident – without drug tests, without due process and without other protective measures being tried first.

373.   In February of 2019 Dr. Asif saw Mr. Reyes and, once again, recommended that his daily medication be increased to 60 mg per day. The corresponding FHS1 entry says only, "PRN" meaning follow-up as needed.  It does not mention the recommendation to increase Mr. Reyes' medication to 60mg.

374.   In February, Mr. Reyes suffered another crisis. In April of 2019 he had another. When Montefiore discharged him, they once again recommended 60 mg of MS Contin twice per day. They repeated the recommendation after a June hospitalization for another crisis.

375.   In June of 2019, Dr. Silver submitted an MWAP.  This time it was reviewed by Defendant Dinello.  With no obvious information on Mr. Reyes' case, nor any effort to find out, Dinello replied, "The Morphine for chronic use has not been approved and is suggested for acute exacerbations only.  A suggest[ed] tapering regimen is included."

376.   At least this time Hammer intervened and explained, "in this particular case, given the SS disease, life expectancy statistics and the opinions of the hematologist and provider, I am inclined to approve the current pain management plan." Dinello responded, "his life expectancy has to be close to hospice like care anyway."

377.   In early July, Mr. Reyes suffered another crisis requiring a 10 day hospital stay. He returned to Green Haven on July 10 and returned to the ER on July 20, 2019 with another crisis.

378.   He was discharged July 29, 2019. Dr. Silver maintained his chronic pain therapy at 45mg twice a day despite the increased frequency of crises. On August 26, 2019 Mr. Reyes was

transferred to Mount Vernon Hospital for yet another diagnosis of dyperkalemia and sickle cell crisis. When Dr. Asif treated Mr. Reyes during this hospitalization he noted, "current pain control is inadequate."

379.    Upon discharge, Dr. Asif prescribed Morphine 60mg every 12 hours. However, when Mr. Reyes was transferred to the Green Haven infirmary on September 4, 2019 Dr. Uzu recorded in Mr. Reyes' progress notes, "no morphine needed when patient is not in a crisis. Percocet 5/325 mg 1 tab order if [inmate] is in a crisis."

380.    When Dr. Silver saw Mr. Reyes on September 5, 2019 he represcribed the morphine at 45mg twice per day. Dr. Silver submitted an MWAP Request form on September 13, 2019, which Dr. Hammer approved at 45mg twice per day.

381.    On November 10, 2019 Mr. Reyes was admitted to the infirmary of Green Haven complaining of crisis. He was admitted to Putnam County Hospital the next day and discharged on November 29, 2019.

382.    On December 29, 2019, Mr. Reyes went into crisis again  and was transferred to Putnam County Hospital. He was discharged again on January 10, 2020. He returned again on February 22, 2020 and was discharged back to Green Haven on March 5, 2020. Dr. Hammer had to review and approve each and every one of Mr. Reyes' hospitalizations, yet, despite the fact that he knew Dr. Asif recommended an increase in Mr. Reyes' pain control, Defendant Hammer did nothing to adjust it.

383.    On May 17, 2020 Mr. Reyes was sent to Mount Vernon Hospital for another crisis and returned on May 29, 2020. Upon his return, Dr. Silver submitted an MWAP for 45mg BID "as previously approved."

384.    On August 16, 2020 Mr. Reyes went into crisis again and was transferred to the hospital and returned on August 24, 2020.

385.    On October 21, 2020, Dr. Silver conducted an MWAP reassessment pursuant to the *Allen* class action litigation, however, he suggested only that Mr. Reyes "currently on MS Contin 45 mg BID," and did not mention that this was a reduction from Mr. Reyes' pre-MWAP treatment levels, nor that the lowered dose contravened Dr. Asif's frequent recommendations.

386.    On November 6, 2020 Dr. Asif saw Mr. Reyes and tried again, stating in his notes, "current pain control could be better…please increase his MS Contin to 60mg PO at 12h his usual dose."

387.    Finally, on November 6, 2020 Dr. Silver submitted an MWAP for MS Contin at 60mg which was approved.

388.    Since Mr. Reyes MS Contin dose was increased, his frequency of crises has greatly decreased and his daily comfort and activity have improved.  He has still suffered crises, but at far less frequent intervals.

389.    Mr. Reyes suffered numerous avoidable hospitalizations and suffering due to the MWAP policy and Defendants' dogged adherence to it despite Mr. Reyes' irrefutable need for adequate pain control.

## FIRST CLAIM FOR RELIEF

### 42 U.S.C. § 1983
### *Deliberate Indifference*
### *(Against Defendants Dinello, Hammer, and Bentivegna, in their individual capacities)*

390.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth herein.

391.    In   approximately   2015,   Dinello   and   other   members   of   DOCCS   medical

administration determined to remove certain medications from DOCCS' facilities – not based on patients' needs or efficacy – but the perceived "abuse potential" of the medication.

392.   DOCCS' Central Office started marking each facility's ability to get their patients off the medications.  Discontinuations were done without medical justification or individualized assessments.

393.   Plaintiff was a victim of this grand plan.  In 2017 when these specious customs and practices of discontinuing effective medications without medical justification were folded into the MWAP Policy, Plaintiff's effective medication was reduce to inadequate levels by Defendants.

394.   Despite the dogged advocacy of Mr. Reyes' treating physician and treating hematologist Defendants refused to represcribe Plaintiff effective treatment due to these policies and customs.  Plaintiff repeatedly and consistently reported his pain and suffering to no avail.

395.   Plaintiff suffered severely for years due to Defendants' adherence to the customs, policies and practices described above.

## **PRAYERS FOR RELIEF**

**WHEREFORE,** Plaintiff requests that the Court grant the following relief against Defendant DOCCS' physicians and administrators in their individual capacities:

A.   Awarding Plaintiff compensatory damages for pain and suffering, including compensation for garden variety emotional damages;

B.   Awarding Plaintiff punitive damages against each Defendant.

C.   Awarding Plaintiff's reasonable attorneys' fees, costs, disbursements, and other litigation expenses, pursuant to 42 U.S.C. § 1988;

D.   Ordering such other and further relief as the Court may deem just and proper.

Dated: New York, New York
      April 20, 2023

**LAW OFFICE OF AMY JANE AGNEW, P.C.**

By: <u>*/s/ AJ Agnew*</u>
Amy Jane Agnew, Esq.
Joshua L. Morrison, Esq.
*Counsel for Plaintiff*
24 Fifth Avenue, Suite 1701
New York, New York 10011
(973) 600-1724
aj@ajagnew.com